*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

FRANKY JOSEPH ACKLEY,

Defendant-Appellant.

UNPUBLISHED
February 11, 2026
8:34 AM

No. 366477; 373633
Jackson Circuit Court
LC No. 20-001529-FC

Before: O'BRIEN, P.J., and MURRAY and LETICA, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of second-degree murder, MCL 750.317, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. He was sentenced to 25 to 50 years' imprisonment for the second-degree murder conviction to be served consecutively to the mandatory two-year sentence imposed for the felony-firearm conviction. Defendant's motion for resentencing before a different judge was granted. After a hearing, a different judge imposed the same sentence. In Docket No. 366477, defendant appeals his convictions for murder and felony-firearm. Specifically, defendant contends that the actions by the prosecutor resulted in the exclusion of evidence of defendant's self-defense claim by rendering his witness Terrell Fung unavailable. Additionally, he asserts that the trial court erred in limiting admission of Fung's statements to the defense investigator to impeachment, not substantive evidence. Finally, defendant contends that a new trial is warranted because the trial court had an ex parte communication with the jury. In Docket No. 373633, defendant appeals his sentences. First, defendant alleges that his sentence of 25 to 50 years' imprisonment for second-degree murder is unreasonable and disproportionate. He further argues that offense variables (OVs) 3 (injury to victim) and 19 (interference or attempted interference with the administration of justice) were improperly scored, depriving him of the right to be sentenced on accurate information. The appeals were consolidated. *People v Ackley*, unpublished order of the Court of Appeals, entered April 29, 2025 (Docket Nos. 366477 and 373633). We affirm defendant's convictions and sentences.

## I. FACTUAL AND PROCEDURAL HISTORY

-1-

On March 5, 2020, between 10:00 and 11:00 p.m., Wesley Edwards went to Duffy's Bar in Jackson with the victim, James Henry Cooper Robertson, and Taylin Alexander. The victim pointed defendant out to Edwards, stating that he had a problem with defendant because of a woman, Brianna Kowalsky. Edwards told the victim not to say anything to defendant and to leave it alone. While in the bar, Edwards did not observe any physical contact between the victim and defendant. Edwards and the victim separated and spoke with different people at the bar. Edwards occasionally looked over at defendant and saw him leave the bar after 20 minutes. Edwards and the victim were going to leave to go to the casino. Edwards proceeded to the restroom, and the victim asked for Edwards's rental car keys to retrieve his phone and marijuana. As Edwards left the restroom he heard gunshots. He saw Alexander was still in the bar, but the victim was not.

Edwards never saw the victim carry a gun on his person. But Edwards learned that there might be pictures of the victim on social media with an AK-47; however, Edwards had not seen them. Edwards had known the victim for twenty years and had never seen him carry his own gun or walk around with one in his pocket.

Terrell Devon Fung[1] left work around 10:30 or 11:00 p.m., showered, and then went to Duffy's. At the bar, Fung mingled and spoke to different people, including defendant. The second time that Fung spoke to defendant, they were outside the bar. At that time, a black male walked around right in front of the bar and exchanged aggressive, argumentative type words with defendant. Fung could not recall the words spoken because he was intoxicated. These two men were approximately six feet away from each other. Fung opened the door to walk into the bar when he heard a gunshot. All of the gunshots occurred within five minutes after the men argued. Fung did not know where the shooting was coming from, and he slid into the bar. He did not see any gun.[2]

On March 6, 2020, at approximately 1:00 a.m., Michael Richards, Duffy's owner, heard three gunshots. He previously worked for the Department of Corrections, was familiar with weapons, and was licensed to carry a weapon. If an incident occurred, Richards went out the bar's back door, had a bartender call 911, and locked the front door to maintain the patrons inside.

Cheri Ann Kasprzycki, who worked as a nurse and was wearing scrubs, arrived at Duffy's at 1:13 a.m. According to her, Duffy's was "the place to be" on Thursday nights and hosted a "DJ." She had been out to dinner and was intoxicated when she arrived. Kasprzycki's group entered the front door, turned left, but did not have the opportunity to order a drink. Kasprzycki

---

[1] Fung was declared unavailable and his preliminary examination transcript testimony was read to the jury.

[2] Former Jackson Police Detective, now court officer, Robert Noppe attended part of Fung's earlier police interview, which lasted for over 46 minutes. At that time, Fung "matter of fact[ly]" claimed that he never saw any guns. Fung explained that he was going in the bar's door when the gunshots occurred. Fung heard aggressive tones and someone state, "You ain't going to do shit," before the shooting.

At the time of the shooting, the record reflects that the victim was 24 years old, 6' tall, and weighed 342 pounds. Defendant was 23 years old, 6' 1" tall, and weighed 145 pounds.

heard loud noises and everyone started screaming. She was informed that the noise was gunfire and to get down. The bouncer told them not to leave.

Edwards also was told that he could not leave the bar. After explaining to staff that he needed to find the victim, Edwards was able to leave and walked to the left where the car was parked. There was no one there. Edwards walked back into the bar but could not locate the victim. Edwards started to call the victim's phone. Edwards left the bar again, heard someone say that the victim was shot, and saw the police arrive.

After hearing the gunshots, Richards left through the back door of the bar and noticed a man on the ground. Richards noticed two men standing there. One man was holding a phone, but the other man had nothing in his hands. Unaware whether the men were involved, Richards patted them down. Richards did not feel any weapons and the men left.[3]

Kasprzycki also left the bar with her group, seeing a body lying underneath a streetlight. Richards, the owner of Duffy's also went toward the body,[4] but Kasprzycki arrived there first. She spoke to the victim, told him that he would be okay, and that she would not leave him. Kasprzycki applied pressure to the victim's sternum, but he did not respond, could not speak, and blood was coming from his back. After Kasprzycki heard the victim's phone ringing, she picked it up and called 911. When the police arrived, they pulled Kasprzycki away from the victim and began treating him.

After Edwards also saw the victim lying in the street, he asked the police for his car keys from the victim so he could drive to the hospital.[5] Ultimately, someone offered to drive Edwards

---

[3] On cross-examination, Richards told the police that he saw the two men as he approached them, and they could have picked up something from the victim because one of the men was hunched over near the victim. But once he conducted the pat down, he did not feel anything.

Jackson Police Department Officer Robert Noppe later interviewed Richards. From his report, Noppe recalled that Richards was the third person to attend to the victim. Two black males were within five feet of the victim's body when Richards came upon it, and he startled them. Richards did not characterize them as hovering over the body, but they hastily moved away from the area. And one man appeared to be hunched over. The men did not have weapons in their hands. Although Richards opined that it was possible that they took something from the victim, he did not see anything. Noppe asked these questions in case he needed to identify or find these men. Richards could not identify the men because his concern was the victim. Richards did not tell Noppe that he conducted a pat down of the men.

[4] Richards testified they rolled the victim over, found gunshot wounds, took the victim's pulse, and called 911. He asked the victim who shot him, but the victim just groaned.

[5] Jackson Police Officer Kelsie Baker spoke to Edwards, who was trying to get to the victim, and took possession of a set of keys.

to the hospital, and he left with them. Edwards never advised the police that defendant should be investigated for the victim's shooting.

Richards had 16 cameras both inside and outside the bar. He gave the footage to the police. The bar's surveillance videos showed that the victim left first. About 15 minutes later, defendant left Duffy's while the victim's friends, Edwards and Alexander, remained inside the bar. Although the victim was seen in Edwards's car, he was never observed going into the trunk.[6]

Jackson Police Officer Andrew Fugate also arrived on the scene and saw several people attending to the victim. They were asked to step away so the police could provide aid. Officer Fugate did not see any weapon in the victim's hand. Another officer provided medical treatment while Officer Fugate was assigned the role of evidence technician. He photographed the scene, including the location of three Smith and Wesson .40-caliber casings. A firearms expert later concluded that all three casings were fired from the same firearm.

Jackson Police Detective Aaron Grove was tasked with investigating the victim's murder and arrived at the bar at 2:30 a.m. Grove watched video surveillance from the bar. He was able to isolate video of the shooter, and the bouncer gave a nickname for Fung who was seen driving a car in the lot. From the nickname, a police lieutenant was able to identify Fung, and he was the last person to interact with defendant, the shooter. At 1:03 a.m., defendant was observed exiting the bar through the fenced area. He then went back into the main bar area. Edwards and Alexander were also seen inside the bar, but the victim was not present. Defendant had writing on the back of his sweatshirt and his hoodie up, making it easier to track his movements throughout the bar. Once again, defendant walked outside. In the parking lot, Edwards's rental vehicle, a Nissan, was visible as was Fung's car. At the end, the video depicted the victim running off toward the bottom of the screen and defendant running toward a white truck.

Grove located Fung at home. Fung voluntarily came to the station and cooperated. After Fung helped the police identify defendant, they made a concerted effort to find him. They spent a couple weeks actively looking for him "around here." There was information that defendant might be in Iowa where he previously lived for a period of time. It was learned that defendant might work in Michigan but live in Iowa. The Cedar Rapids Police Department was asked to assist. In late March 2020, the police also asked the U.S. Marshals for help in locating defendant. They found him in the Cedar Rapids area on July 22, 2022, and brought him back to Michigan.

Defendant was active on Facebook, sending and receiving messages. After the shooting on March 6, 2020, at 1:17 a.m., defendant stopped using Facebook to send messages. His last logged Facebook location was a Travelodge in Jackson, Michigan. Additionally, his profile picture was a moving image of defendant holding a handgun with his face covered. Although

_____

[6] Edwards was licensed to carry a firearm, a Ruger .380. However, he had left his gun in the trunk of his rental car that evening and did not have it on his person. The victim was aware that Edwards had the gun because the victim saw Edwards put it there. Although a gun was later found in Edwards's rental vehicle, it was legally purchased by him, properly carried in the vehicle, did not match the caliber of the casings found at the scene, and was returned to Edwards.

-4-

Grove received defendant's phone in July 2020, its contents could not be examined because of password protections.

The medical examiner determined that the victim suffered a gunshot wound to the chest that perforated his lung and heart sac. There was a second gunshot wound on the side of his thigh. The shots were fired from a distance of at least two feet. The cause of death was multiple gunshot wounds, particularly the chest wound, and the manner of death was homicide.

At trial, Kowalsky testified that she had known defendant since the age of 14 and she was now nearly 23 years old. They began a relationship at age 14 that lasted until she was 21. She had known the victim for a couple years before his death and began seeing him in October 2019. In January 2020, Kowalsky went to Iowa to visit defendant for seven days. When she returned to Michigan, she began her relationship with the victim again. Two weeks before March 6, 2020, defendant came back to Michigan, and Kowalsky was seeing both men. Kowalsky denied that the men had issues with each other despite acknowledging that they bickered on Facebook about her. She further testified that defendant carried a gun when he was younger, but he grew up over the years. And Kowalsky denied seeing the victim with a gun. She acknowledged that the victim had pictures on Facebook with a gun, but they were just "to show." Additionally, defendant had never threatened anyone with a gun.

On March 5, 2020, defendant was supposed to come to Kowalsky's grandmother's home, but he did not arrive. Kowalsky began to inundate and insult defendant with messages because he was at Duffy's and did not show up at her house. Defendant did not respond. And, instead, Kowalsky had a Facetime call with the victim from 11:57 p.m. for just over 28 minutes, until the victim's phone ran out of power. Kowalsky learned from the victim that defendant was at Duffy's. Kowalsky testified that defendant did not know that the victim regularly went to Duffy's on Thursdays and did not know that Kowalsky was back in a relationship with the victim. On redirect examination, however, Kowalsky admitted she was unaware of defendant's personal knowledge regarding her relationship with the victim.

Nathan Gross, a paid investigator for defendant, testified that he previously worked for the Jackson police, the medical examiner as a field investigator, and the prosecutor's office. For the last three years, however, he worked as a private investigator. After reviewing video from Duffy's, Gross believed that Fung was not telling everything he knew. Gross opined that Fung looked back at the interaction between defendant and the victim before the shooting. A flash occurred and the victim looked as if something was wrong. Gross interviewed Fung about the video, telling him that it did not appear that the video matched the police report. Fung looked at Gross, who informed Fung that Gross could "see it clearly on the video[.]" After confirming that Fung had seen the video, Gross stated: "[Y]ou're standing there watching[.]" Fung agreed. Gross continued to interview Fung, who stated that the victim said "something" and drew a semi-automatic black gun. Then, defendant drew his gun. At that point, Fung entered the bar because he did not want to get shot. In Gross's experience, this was not the first time that a witness provided additional details to their initial account. Gross opined that, if there was a "good detailed initial interview" properly done, a second interview was unnecessary.

On cross-examination, Gross admitted that Fung referred to defendant as his "nephew"[7] and acknowledged that he was friends with defendant's family, at least Fung's parents. Gross also acknowledged that, in the video, Fung's head was not visible, only the top of his right shoulder and arm. When asked if Fung was not looking outside, but inside the bar, Gross testified: "Anything's possible." It was also plausible that defendant was looking at his phone. Indeed, Gross acknowledged that he *believed* Fung was looking outside. And Gross admitted that Fung never previously told anyone that the victim had a gun. During Fung's statement, there was no prosecutor or judge present to ask follow up questions, and Fung was not under oath and subject to the penalty of perjury at the time.

The trial court instructed the jury, including on self-defense. When jury deliberations were to commence, a juror did not appear but called to advise of a childcare issue. The trial court consulted with the parties and an alternate juror was able to be recalled. Before the start of deliberations that included the alternate juror, the trial judge advised the parties of his intention to speak to the jury to address the "rule of twelve." Defense counsel did not object. Ultimately, the jury acquitted defendant of first-degree murder, MCL 750.316, and convicted him of second-degree murder and felony-firearm.

## II. WITNESS UNAVAILABLE

Defendant first alleges that the prosecutor threatened to charge Fung with perjury and lying to police in order to intimidate him from testifying. We disagree.

The trial court's determination that a witness is unavailable will not be supplanted unless a clear abuse of discretion is demonstrated. *People v Bean*, 457 Mich 677, 684; 580 NW2d 390 (1998). Factual findings underlying the trial court's unavailability determination are reviewed for clear error. See *People v Garland*, 286 Mich App 1, 7; 777 NW2d 732 (2009). Clear error occurs when the appellate court is left with a definite and firm conviction that a mistake was made. *People v Abbott*, 330 Mich App 648, 654; 950 NW2d 478 (2019). Preserved evidentiary issues are reviewed for an abuse of discretion. *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). An abuse of discretion occurs when the decision falls outside the range of principled outcomes. A decision on a close evidentiary question generally cannot constitute an abuse of discretion. *Id.* at 251-252.

"Questions whether a defendant was denied a fair trial, or deprived of his liberty without due process of law, are reviewed de novo." *People v Steele*, 283 Mich App 472, 478; 769 NW2d 256 (2009). A constitutional right may be forfeited by the failure to timely assert the right. "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id.*

---

[7] Fung admitted that he and defendant were not related by blood.

At the prosecutor's request, the trial court held a hearing on Friday, January 6, 2023, just before the jury trial scheduled to begin the following Monday. The prosecutor referred to a transcript and recorded interview from defense counsel that caused concern:

> Yesterday, [defense counsel] provided to my office a vocal transcript and a recorded interview of kind of one of the main eyewitnesses. That recorded interview and transcript outlined that, that main eyewitness [Terrell Fung] is changing what he testified to previously, changing it in a very large way. I have grave concerns about now his testimony, if he testifies consistent with what he shared with [defense counsel's] investigator at some point he's committed perjury, whether it's at the preliminary exam or whether it's up here. I have a meeting set with him at one o'clock today, I have no reason to believe that he won't show up to that meeting, I have to go back and talk to him without an attorney appointed for him judge. I believe he has put himself now in a position where he has potentially lied in a violent crime investigation where he is potentially putting himself at risk for perjury and I think somebody should advise him of those rights, that's not me, before I even meet with him. I don't, I don't feel comfortable, you know I have to kind of look at all sides of this. So I'm asking the Court to simply appoint an attorney for Mr. Fung and let that attorney try to meet with him today, I think [defense counsel] and I both have good contacts for him, they were able to find him, he's supposed to come in and meet with me at one.

The trial judge, the prosecutor, and defense counsel then discussed the attorneys available to be appointed to represent Fung from the public defender's office. Defense counsel identified the attorney that was available from the public defender's office without agreeing with the prosecutor's representations about Fung's statements and perjury. The trial court indicated that an order of appointment would be prepared. The prosecutor questioned whether appointed counsel would want to come and meet with Fung at 1:00 p.m., the time she was scheduled to meet with him. The trial judge asked if the interview should be recorded. Defense counsel responded:

> That's fine and - - and I get this probably will be, I guess, lets back up for a second and let me say this. The individual that were talking about is Terrell Fung, okay. And I completely disagree with the way the prosecutor has categorized what he said before and what he's saying now. If you look at his original interview, the questioning that was done by him from law enforcement was just poorly done. When I read that interview there are a lot of questions that I had, which is why I sent an investigator out to talk to him. He has not changed what he had said; he has added to it, he has given up additional detail. What he has said is completely consistent with what you see on the video and his position when he's standing there watching what unfolded before him. Whether he needs an attorney or not I don't - - I don't have an opinion about it. I - - he's not committing perjury. When he gave his interview to, to Nat Gross they got into what you said before, what additional detail you're giving us now, why we're adding that additional detail that didn't come out before, all that's in the interview and none of it suggests perjury. You know, I know that she, Mr. Fung was supposed to meet with the prosecutor at one o'clock, whether that meeting takes place or not, whether there's an attorney or not

or - - or anything else that happens to her I just, I don't think it has anything to do with us.

The trial court responded that the "State" wanted an attorney and that it would not be harmful to the witness. The court stated, "I think it's probably better if he's advised of those rights by an independent attorney and so, I'll have Paul [Haas, the trial court officer and clerk] prepare the order to that affect and we'll also require as part of that that he show up for that scheduled appointment[.]" The prosecutor asked that appointed counsel meet with Fung first before her meeting with him, noting, "I just don't feel comfortable talking to him without him having his own attorney." The hearing recessed at 11:18 a.m. but resumed at 3:00 p.m. on the record.

The prosecutor summarized the morning hearing and subsequent events:

Obviously, what I outlined this morning []is that Terrell Fung is, outside of the video[,] kind of a main eyewitness of the case. He gave a statement to law enforcement after the homicide occurred[;] he testified in the preliminary exam on the second day of the preliminary exam. Previously he was specifically asked if he ever saw any guns and he said nope, never saw any gun, I can give you the exact verbiage of it, do you have it right there? The question was[:] ["Y]ou said you heard gunshots, did you see any sort of guns[?] ["N]ope I didn't see nothing.["] ["]Did you see anything after[?] I know you said you ducked into the bar once you heard the gunshots[.] [D]id you happen to look back and see anything[?"] ["U]h-huh, I didn't even look back. When I heard the gunshot I just ducked into the bar because it was coming from behind me[.] I'm trying to not get hit in the back or anything so that's why I just ducked into the bar and stayed there.["]

I was provided[,] as I outlined this morning, yesterday morning and [sic] interview done by an investigator for the defense where Mr. Fung has now stated he not only saw one gun, but saw two guns, a gun in both [defendant's] hand and James Cooper, my victim[']s hand. That - - that - - that's impactful to a homicide trial, as this Court knows, does everybody in here know it impacts voir dire, it impacts opening, it impacts witness order, it impacts everything judge. I met with Mr. [Al] Brandt who is now retained, as the court knows, the court appointed the public defender's office and Mr. Brandt came and saw me at the appointed time and said he had been retained by Mr. Fung. And in my conversations with Mr. Brandt, it appears that potentially Mr. Fung does not believe that this puts him or maybe Mr. Brandt or [defense counsel] or whomever does not believe that this puts him in perjured testimony, it absolutely does. I cannot suborn perjury; I don't want to spend the next three days prepping a homicide and not have an understanding of what's going to happen. So I'm asking the Court to start with is Terrell Fung going to testify, if he's going to take the Fifth, if he's going to testify and in what version of events is he going to give.

In response to the trial court's question, the prosecutor clarified that Brandt and Fung did not have a conversation in front of her but left together. She was unaware of the content of their conversation, and she "was not privy to their attorney[-]client relationship." The prosecutor's meeting with Fung never occurred and she did not talk to him.

Defense counsel then played a portion of the video of the shooting. On the record, he described defendant wearing a dark-colored hoodie and "crossing paths at the front door" of the bar. Another individual, Fung, was then depicted wearing a jacket with block colors of black, white, and blue. After interaction between Fung and defendant, Fung turned his head in the bar's doorway. But Fung then turned his head and faced defendant and the victim. The victim proceeded to move backward. Fung then began to enter the bar as the victim was no longer visible on screen. Defense counsel asserted that it was apparent that "Fung was standing in the doorway watching the whole thing happen as it happened." He further argued that, when the video was slowed down, a muzzle flash from defendant toward the victim indicates a shot fired, and it occurred when Fung was still in the bar's doorway. The trial court interjected to note that it was not apparent whether the door was still open and how far Fung was in the doorway. Defense counsel agreed with the trial court but noted that Fung was not inside the bar and was facing toward the activity occurring between defendant and the victim. He further alleged that the police arrived at Fung's home between two and four hours after the shooting and aggressively treated him as a potential suspect or aider and abettor instead of a witness. The police allegedly surrounded Fung's home with guns drawn and demanded that he come to the police station for an interview. And that police interview seemed to focus on locating defendant. Defense counsel claimed that Fung was "reluctant" because the police treated him as a potential suspect.

The trial court inquired whether "the State" would be suborning perjury, whether Fung changed his testimony, or whether Fung was simply willing to give more information. Defense counsel asserted that as a case progressed, additional information always was revealed. If this additional information did not comport with the prosecutor's theory of the case, there was an assertion that the witness should be charged with perjury. Defense counsel stated:

So your Honor, when I read the police report summary of Mr. Fung statement, then I got his recording . . . transcribed with his interviews with the police and I compared what he said he saw versus what I can tell he really saw cause he's standing in the doorway watching the whole thing I know that he saw more than what he said in his statement to the police, more than what he testified to in District Court and so I had Officer Gross go out and interview him and in that subsequent interview, it happened earlier this week with Officer Gross he does get, I mean Officer Gross, we know he know how to do interviews and he's as good as it gets, know his history. He questioned him very carefully, took him through step by step, detail by detail and - - and Mr. Fung came forward with information that both [defendant] and [the victim] did have firearms in their hands, he was able to describe them by color, that they were semi. He was able to describe who pulled first, he was able to describe who shot and we know he's not making it up because we can see on the video that he was actually in a position to see exactly what he said he saw. So this isn't coming from left field, this isn't, we don't have any corroboration or he's obviously making this up [be]cause he didn't say it before. The court seen that he was in a position to see exactly what he told Officer Gross that he saw. And - - and so now that this new information from a prosecution witness is contrary to their theory of the case they have now apparently threatened to charge him with perjury if he does come forward with this additional information.

Defense counsel noted that Fung's major change from the preliminary examination testimony was that the victim did not have a weapon to saying that the victim had a weapon. It was asserted that Fung's preliminary examination testimony was "meaningless" because of the lack of information known to the attorneys and district court at that time. Defense counsel stated that Fung did not appear at the preliminary examination the first time. It had to be rescheduled, but then Fung did attend. And, at the interview with Gross, Fung stated that he did not want to be involved and did not want to testify. But defendant needed him to testify as to the "truthful version of events," and defense counsel did not think that Fung was committing perjury. If only Fung had been "interviewed properly" and "asked all the right questions," this information would have been presented and there would be no "threat of the perjury charge."

Although the prosecutor agreed with the defense that facts do change, the video showed Fung's sleeve and did not indicate if he was actually watching the shooting or looking forward as he headed into the restaurant. The trial judge stated that he had been to that bar and there was a long narrow hallway before arriving at the bar, and it was not located in a high crime area. He further stated that one could not tell, from the video, if the door was open and if Fung was down the hallway. Defense counsel agreed that there was a lack of clarity in the video and "the best I can show you is how long he absolutely was in that doorway facing that direction to be an observer." The prosecutor stated that Fung could not be called as a witness because she would be "suborning perjury." The trial judge noted that defendant had been jailed for two years and questioned the issue being raised at the "eleventh hour." He asked whether defendant should be cut "loose" if the prosecutor was "not ready to proceed[.]" The prosecutor stated that she was ready, received this new information yesterday, and believed that Fung was unavailable and his preliminary examination testimony could be used at trial. The prosecutor alleged that Fung's testimony had not evolved but was completely different. When a witness's statement did not comport with the evidence, he was cut loose because a witness was not permitted to lie and give perjured testimony. And, if Fung's testimony did not comport with the evidence in the case, it would be reviewed for a perjury charge, a capital, life offense.

Fung's counsel, Brandt was present in the courtroom, and the trial court inquired if counsel had anything to tell the court. Brandt stated, "Your Honor, the only thing I can tell the court right now is Mr. Fung will be here on Monday." In response, defense counsel stated:

> Great minds think alike. Your honor it's, Mr. Brandt's ultimately going to be the one to advise Mr. Fung to testify or not to testify. And, and I know [the prosecutor's] in the same position I am[;] we'd like to know now as opposed to Monday, should Mr. Brandt actually have that information and choose to share it. For example[,] if Mr. Brandt informs us Mr. Fung's not going to testify then both the prosecutor and I have a number of alternatives that we're probably going to want to fight about and you may want that fight to be taken [sic] place now as opposed to Monday morning.

Brandt stated that he had a long discussion with Fung and previously represented him in the past. Brandt thought that Fung would tell the trial court the truth consistent with his statement to the defense investigator. But Fung was under threat of being charged with two felonies and would like to avoid that. Fung would be willing to state his name, admit he was at the bar, and state what he saw. But when asked about the preliminary exam testimony, Brandt would advise

Fung to assert the Fifth Amendment because perjury is defined as a "false statement." The trial court questioned whether the assertion of the Fifth Amendment would require striking all the testimony. Defense counsel claimed that it did not. The prosecutor questioned whether any testimony could occur in front of the jury and whether an offer of proof would have to occur. The trial court asked the parties to brief the issue regarding the assertion of the right during a jury trial and to have Brandt present at trial. Defense counsel noted that if Fung pleaded the Fifth Amendment, the prosecutor would seek to admit the preliminary examination testimony while defendant would want the interview with defense investigator Gross admitted. The trial court stated that those issues would be explored on Monday. The trial court would address the legal issue pertaining to Fung in the morning and to call the jurors in the afternoon.

Before trial commenced, the parties met. Brandt and Fung were present. Brandt spoke first to obviate the parties' need to discuss the constitutional issues. After conducting research and speaking extensively to Fung, Brandt advised Fung to assert his Fifth Amendment right to remain silent, and Fung opted to take that advice. Brandt's legal research determined that Fung could not assert the right in a piecemeal manner. Fung was sworn in and expressly stated on the record that if called as a witness by either party, he would assert his Fifth Amendment rights. The parties agreed to allow Fung to leave under subpoena provided Brandt could reach him if necessary.

The prosecutor alleged that Fung was now unavailable and sought to admit his preliminary examination testimony. Defense counsel sought, and the court admitted, both a copy of the preliminary examination testimony and Fung's interview with investigator Gross into the record. Defense counsel asserted that the testimony was short and undetailed and the cross-examination was not extensive. Because Fung's statement to Gross was detailed, defendant wanted that information in front of the jury. Defendant sought a remedy to allow the information to be given to the jury in a manner that did not imperil Fung obtaining criminal charges. He argued that prosecutor intimidation arising from charges of witness tampering or perjury to prevent witnesses from testifying would result in a Sixth Amendment violation of the right to present a defense. Defense counsel stated that if self-defense was a "realistic option as a defense," it was necessary to place Fung's information before the jury. Moreover, the prosecutor had the opportunity to interview Fung on Friday, but she chose not to. Fung's assertion of the right to remain silent and unavailability were caused by the prosecutor's threat of perjury when Fung was trying to tell the truth. Defense counsel opined that the trial court and prosecutor could grant Fung immunity to allow him to testify freely. Otherwise, defendant's right to present a defense was implicated because Fung was the only witness to the events between defendant and the victim. In response, the trial court also noted that defendant could have moved for the prosecutor's attendance at Fung's interview with Gross but defendant did not do so. Additionally, the court noted there was a fundamental difference between a defense interview and the preliminary examination testimony. Defense counsel denied that he could compel the prosecutor's attendance at Gross's interview with Fung and was unaware of what Fung would say during his statement.

The prosecutor denied that she created the problem pertaining to Fung's testimony. Fung did not come to the prosecutor and state that he was changing his story. And she did not threaten Fung with perjury if he sat across from her and stated different facts. Instead, late on Thursday, the prosecutor was advised of Fung's defense interview. The criminal justice system broke down when witnesses failed to tell the truth, and Fung was now unavailable. Additionally, the prosecutor's review of the caselaw indicated that Fung could testify in a piecemeal manner;

however, Fung countered that any testimony triggered the Fifth Amendment. Therefore, the preliminary examination testimony was admissible regardless of the number of questions posed and the opportunity for cross-examination occurred. Defense counsel then clarified that he did not seek to admit Fung's interview transcript, but sought to have Gross testify about the statements Fung had made to him.

The trial court ruled that Fung was effectively unavailable. Fung did not appear at the initial preliminary examination but testified when it was rescheduled. Although his direct and cross examination was limited in scope, it satisfied the rule. Because Fung exercised his Fifth Amendment right to remain silent, he was effectively unavailable and could not be compelled to testify. The trial court did not have the option to grant Fung immunity. The trial court agreed with defense counsel's request to apprise the jury that defendant's current trial attorneys did not conduct the questioning at the preliminary examination.

On appeal, defendant contends that the prosecutor "kept" Fung off the witness stand or rendered him unavailable by threatening to charge Fung with perjury, MCL 750.422, and lying to a police officer, MCL 750.479c(1)(b), and that this action deprived defendant of the right to present a defense. We disagree.

At the time of trial (January 2023), MRE 804(a)[8] addressed unavailability of a witness:

(a) Definition of unavailability. "Unavailability as a witness" includes situations in which the declarant-

\* \* \*

(2) persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so;

\* \* \*

A declarant is not unavailable if exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of a statement for the purpose of preventing the witness from attending or testifying.

(b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, if the party against whom the testimony is now offered,

---

[8] The Michigan Rules of Evidence were revised effective January 1, 2024. See 512 Mich lxiii (2023). We refer to the rule in effect at the time of defendant's trial.

or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

In *People v Meredith*, 459 Mich 62, 65-66; 586 NW2d 538 (1998), our Supreme Court addressed the availability of a witness who exercised the right to remain silent:

> While invocation of the Fifth Amendment[9] is not expressly treated in MRE 804(a), it is of the same character as the other situations outlined in the subrule. Further, while "unavailability" is a term of art under MRE 804(a), it also bears a close nexus to the ordinary meaning of the word. Thus we often have recognized that a witness, in fact, is unavailable who cites the Fifth Amendment as a justification for not testify. . . .

> Rule 804(b)(1) of the Michigan Rules of Evidence provides that, where a witness is unavailable, testimony given by the person at an earlier hearing is not excluded by the hearsay rule if the party against whom the testimony is offered had an opportunity and similar motive to develop the testimony through cross-examination. [footnotes and citations omitted.]

Under the state and federal Constitutions, a criminal defendant has the right to present a defense. Const 1963, art 1, section 13; US Const, Ams VI and XIV. A defendant may properly raise self-defense and has the burden of production of some evidence from which the jury could conclude that the essential elements of self-defense are present. *People v Leffew*, 508 Mich 625, 643-644; 975 NW2d 896 (2022). If a defendant presents some evidence to support an affirmative defense, an instruction consistent with that defense should be given. *Id*. at 644. This burden is not heavy. After a defendant meets his initial burden of producing some evidence to allow a jury to conclude that the elements of self-defense exist, the prosecutor has the burden of disproving the affirmative defense beyond a reasonable doubt. See *id*. The jury must decide whether there is sufficient evidence to support the self-defense theory upon proper instruction. *Id*.

The right to present a defense is not absolute. *People v Solloway*, 316 Mich App 174, 198; 891 NW2d 255 (2016). "The defendant must still comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Id*. (quotation marks and citation omitted).

The right to call defense witnesses requires that they be called without intimidation. *People v Pena*, 383 Mich 402, 406; 175 NW2d 767 (1970). "A prosecutor may impeach a witness in court but he may not intimidate him – in or out of court." *Id*. "However, a prosecutor may inform a witness that false testimony could result in a perjury charge." *People v Layher*, 238 Mich App 573, 587; 607 NW2d 91 (1999). "The plain language of the exception to 'unavailability' under MRE 804(a) mandates that the court consider whether the conduct of the proponent of the statement was for the purpose of causing the declarant to be unavailable." *People v Lopez*, 501

---

[9] In pertinent part, the Fifth Amendment states, "No person . . . shall be compelled in any criminal case to be a witness against himself[.]"

Mich 1044 (2018).[10]  A witness's unavailability caused by a perceived threat from the prosecutor was insufficient.  Rather, the trial court must consider "whether the witness was unavailable due to the prosecutor's procurement or wrongdoing for the purpose of preventing the witness from attending or testifying, consistent with MRE 804(a).  *Id.*  That is, "whether the prosecutor intended to cause the declarant to refuse to testify when engaging in that conduct."  *Id.*

In *People v Robbins*, 131 Mich App 429, 435; 346 NW2d 333 (1984), the victim of a kidnapping was "compelled to testify after the trial court rejected her attempts to assert the spousal privilege and the privilege against self-incrimination and despite her assertion that she feared for her life."  However, the victim's testimony was full of inconsistencies and contrary to the physical evidence and the testimony of two witnesses.  *Id.* at 435-436.  Consequently, on appeal, the defendant challenged the admission of the victim's prior inconsistent statements and alleged that the prosecution's intimidation of the victim prevented him from calling her as a defense witness.  This Court rejected the defendant's claim of prosecutorial intimidation:

> Because the victim was a res gestae witness whom the prosecutor was obligated to call, it was not error to permit the prosecution to impeach the victim.  *People v Murry*, 108 Mich App 679, 683; 310 NW2d 836 (1981), see also *People v White*, 401 Mich 482, 508; 257 NW2d 912 (1977).  The jury was repeatedly instructed as to the limited permissible use of the victim's prior inconsistent statements.

> The inconsistencies between the victim's testimony at trial and her prior statements to the police were so serious that the prosecutor requested the trial court to find the victim in contempt of court or to hold her for trial on perjury charges.  The trial court denied the prosecutor's request; however, the victim's well-founded fear of a perjury prosecution led to her invocation of the privilege against self-incrimination and her refusal to testify as a defense witness.  In *Webb v Texas*, 409 US 95; 93 S Ct 351; 34 L Ed 2d 330 (1972), the trial court singled out the only potential defense witness and, in strong and threatening language, warned the witness that he would face a perjury prosecution if he lied while testifying.  The witness subsequently refused to testify.  The Supreme Court held that the unnecessarily strong terms used by the trial judge, the authority of the trial judge's position, and the trial judge's apparent assumption that the victim would lie if he testified prevented the witness from making a free and voluntary choice whether to testify and thus deprived defendant of his right to present evidence in his defense.  However, where the extraordinary circumstances on which the *Webb* decision was based were not present, warnings to potential defense witnesses concerning self-incrimination or possible perjury charges have been held to be proper.  See *United States ex rel Robinson v Zelker*, 468 F2d 159, 162, fn 5 (CA 2, 1972); *People v Pantoja*, 35 Ill App 3d 375, 380; 342 NE2d 110, 114 (1976); *State v Brown*, 321 A2d 478 (Me, 1974); *State v Whiting*, 117 NH 701; 378 A2d 736 (1977); *State v*

---

[10] Although only an order, "Supreme Court orders that include a decision with an understandable rationale establish binding precedent."  *People v Giovannini*, 271 Mich App 409, 414; 722 NW2d 237 (2006).

*Schaub*, 46 Ohio St 2d 25; 346 NE2d 295 (1976); and *Hedgepath v State*, 600 P2d 348 (Okla Crim App, 1979).

> Nothing analogous to the extraordinary circumstances on which the *Webb* decision was based was present here. In this case, the issue did not arise until after the victim testified in a manner which, combined with her prior statements to the police, provided an obvious basis for the perjury charge. The trial judge here did not use strong or threatening language to the victim; instead, the prosecution's request that the victim be found in contempt or held for perjury charges was denied. The record here does not suggest that the decision of the victim not to testify further was not free and voluntary; rather, the record suggests that the decision of the victim was based on an accurate appraisal of her legal situation following consultant with her own counsel. No error occurred. [*Id*. at 438-440.]

Defendant contends that reversible error occurred because the prosecutor in the present case relied on intimidation tactics that occurred in *People v Reed*, unpublished per curiam opinion of the Court of Appeals, issued February 13, 2020 (Docket Nos. 327639; 350189; 350190), pp 1-2. In *Reed*, two defendants alleged that the prosecutor made threatening remarks that caused a witness, Dennis Hoskins, to refuse to testify at trial. Specifically, Reed's attorney alleged that, although Hoskins stated that the defendants revealed their involvement in a murder to him, Hoskins later claimed that he gave such false testimony at the preliminary examination because he was angry with the defendants. After the prosecutor learned that Hoskins refused to testify at trial, the prosecutor met with Hoskins without his attorney being present and informed Hoskins that he faced perjury charges and life imprisonment. The matter was remanded to the trial court for an evidentiary hearing to address whether the prosecutor's actions were designed to render Hoskins an unavailable witness. The trial court concluded that the prosecutor personally met with Hoskins without permission from Hoskins' attorney, used a threatening and aggressive tone, and gave an improper assessment of the law. On appeal, this Court determined that the trial court's factual findings were not clearly erroneous and that a new trial was warranted:

> From the available circumstances, the trial court did not clearly err by finding that the prosecutor made aggressive and threatening statements about life imprisonment in an attempt to "make Hoskins feel that if he was going to testify inconsistent with his preliminary examination testimony, he would get life in prison." From this, the trial court reasonably concluded that the prosecutor intended to scare Hoskins into either testifying as he did at the preliminary examination or choosing not to testify for fear of the consequences, thereby making himself unavailable and allowing the prosecutor to use his preliminary examination testimony instead. Such a finding prohibits the application of MRE 804 and the admission of Hoskins's preliminary examination testimony. [*Id*. at p 9.]

In the present case, the factual circumstances do not reflect a calculated effort and threats by the prosecutor to prevent Fung from testifying at trial and to obtain the admission of his preliminary examination testimony instead. Moreover, the trial court did not make factual findings in support of aggressive conduct and threats by the prosecutor as posited by defendant. The prosecutor had Fung's testimony from the preliminary examination and it did not disclose that the victim had or brandished a gun during the altercation with defendant in the parking lot. However,

-15-

the Thursday before a Monday trial date, the prosecutor received from defense counsel Fung's statement now reflecting that the victim had a weapon. The statement was not sworn under oath, and during it, Fung acknowledged that he referred to defendant as "nephew" and knew his parents. The prosecutor was scheduled to have a meeting with Fung the next day at 1:00 p.m. As a result of the defense information, the prosecutor expressed concern to the trial court that Fung was changing his testimony, could possibly be subjecting himself to criminal liability for perjury and lying to a police officer, and should meet with an attorney to advise him. The prosecutor requested that the trial court appoint counsel for Fung before their scheduled meeting.

The prosecutor's actions were consistent with Michigan caselaw. In *People v Bassage*, 274 Mich App 321, 322; 733 NW2d 398 (2007), the defendant sought dismissal of the charge of perjury committed in a court proceeding for a capital crime, MCL 750.422. The defendant claimed entitlement to dismissal because when called to testify as a prosecution witness in an underlying murder case, he was forced to choose between incriminating himself for filing a false police report or lying. The defendant argued that he was never advised of the Fifth Amendment right not to incriminate himself such that his constitutional rights were violated and his testimony could not be used at his perjury trial. This Court affirmed the denial of the defendant's motion to dismiss. *Id*.

Specifically, the defendant was subpoenaed to testify at Joseph Flowers's trial for open murder. The defendant was the owner of the handgun that Flowers used to commit the murder, and shortly after the murder, the defendant claimed that the handgun was stolen from his Jeep. At the courthouse before his testimony, the prosecutor advised the defendant that there was evidence that contradicted the defendant's claim that his gun was stolen from his vehicle. Nonetheless, the defendant claimed that the other evidence proffered by the prosecutor was false. Before the defendant testified, the prosecutor informed the trial judge and Flowers's counsel that he would likely give false testimony. But the prosecutor did not seek to advise the defendant of his Fifth Amendment rights, contending that the defendant would not incriminate himself. At trial, the defendant testified that he did not loan his handgun to Flowers and that it had been stolen. The prosecutor charged the defendant with perjury, but he sought to dismiss the charge, alleging that his testimony was obtained in violation of his Fifth Amendment right against self-incrimination. The trial court denied the motion to dismiss, determining that the defendant did not have a right to commit perjury. *Id*. at 323-324.

This Court affirmed, concluding that the right against self-incrimination was never implicated because perjured testimony involved the commission of a current crime and did not pertain to a prior crime. *Id*. at 325. And although the defendant was not advised of his right against self-incrimination, the defendant was never authorized to provide false testimony and engaged in action that the Fifth Amendment did not give him a privilege to take. Moreover, this Court advised that, even if the prosecutor had violated the defendant's Fifth Amendment right against self-incrimination, his testimony would not be protected because a person had no right to present false testimony "even in the face of governmental wrongdoing." *Id*. at 326. A deprivation of constitutional rights did not give rise to a license to commit perjury. *Id*. at 327.

Additionally, the law is clear that "[a] lawyer may not knowingly offer inadmissible evidence or call a witness knowing that he will claim a valid privilege not to testify." *People v Dyer*, 426 Mich 572, 576; 390 NW2d 645 (1986); *People v Giacalone*, 399 Mich 642, 645; 250

NW2d 492 (1977). The privilege against self-incrimination is held by the witness, but the witness is the not sole determiner of whether the testimony is or may be incriminating. *Dyer*, 426 Mich at 578-579. Rather, the trial court may compel the witness to answer a question only if it can foresee that the testimony will not incriminate the witness. *Id*. at 579. Accordingly, the trial court must properly appoint an attorney for the witness, conduct an evidentiary hearing outside the presence of the jury, and ascertain whether the witness intends to "plead the Fifth" on the record. *Id*.

In *People v Poma*, 96 Mich App 726, 732-733; 294 NW2d 221 (1980), this Court delineated a specific methodology and underlying rationale to be employed:

> When the court is confronted with a potential witness who is intimately connected with the criminal episode at issue, protective measures must be taken. The court should first hold a hearing outside the jury's presence to determine if the intimate witness has a legitimate privilege, as was done in the instant case. This determination should be prefaced by an adequate explanation of the self-incrimination privilege so the witness can make a knowledgeable choice regarding assertion. This was not done in the instant case. In fact, when asked if he understood the privilege, the witness commented "Nobody's explained it to me, but I can figure it out myself". We do not believe that the burden of comprehending the privilege should rest with witnesses; the responsibility of informing must be the court's.

> If the court concludes that the witness has no legitimate privilege, it should consider contempt penalties or other alternate remedies against the witness. Yet, with respect to the defendant, the court must proceed to determine if the witness intends to assert that privilege, whether validly or invalidly, at trial. If the intimate witness intends to claim the protection of the Fifth Amendment at trial, there really is no way to prevent prejudice to the defendant absent barring that witness. As noted, a cautionary instruction that no negative inference is to be drawn from the witness's taciturnity is ineffectual. . . .

> We hold that it is inherently prejudicial to place a witness on the stand who is intimately related to the criminal episode at issue, when the judge and prosecutor know that he will assert the Fifth Amendment privilege. When a judge determines at the evidentiary hearing that the intimate witness will either properly or improperly claim the protection against self-incrimination, he must not allow this witness to be called to the stand. [Citations omitted.]

See also *People v Paasche*, 207 Mich App 698, 709-710; 525 NW2d 914 (1994).

Contrary to defendant's assertion, the trial court and the prosecutor complied with the appropriate procedure when apprised that a witness may commit perjury. That is, after the prosecutor learned that Fung would testify that the victim had a gun, she requested that an attorney be appointed to represent Fung to advise him. The prosecutor also noted that she could not suborn perjury and Fung's actions could result in charges of perjury or lying to a police officer. The prosecutor sought to have the trial court act quickly because she learned of the change in testimony on Thursday, she requested the appointment of a public defender to Fung on Friday, and trial was

-17-

to commence on Monday. Additionally, the prosecutor sought to have counsel meet with Fung before her scheduled meeting with Fung. And, after Brandt met with Fung, the prosecutor did not have her meeting.

Initially, defense counsel merely asserted that Fung did not change his testimony, but rather supplemented it to account for a deficient police interview and preliminary examination questioning. After the trial court ordered that a public defender be appointed to apprise Fung of the consequences of testifying, it was learned that counsel Brandt was retained to advise Fung. Brandt initially agreed with defendant's defense counsel that Fung could testify. The trial court asked the parties to brief the issue and meet before trial commenced on Monday. However, when Monday morning arrived, Brandt advised that he had performed additional research and now recommended that Fung assert his Fifth Amendment right. The trial court made the inquiry of Fung outside the presence of any jurors, and he expressed his intent to assert his right. Although the parties discussed whether Fung could take the stand and answer some questions, he did not testify at trial. Defendant asserts that it was the prosecutor's "threats" to charge Fung with perjury and lying to a police officer; however, unlike in *Reed* as cited by defendant, the prosecutor did not have direct contact with Fung before he retained counsel Brandt nor thereafter. Additionally, there was no indication that this prosecutor made aggressive threats and advised Fung that the penalty for perjury was life. Instead, the prosecutor raised the issue of potential perjury before the trial court, ensured that Fung was appointed or retained counsel, and did not directly communicate with Fung regarding the consequences of his testimony.

Fung's Fifth Amendment rights did not "condone or protect perjury" because providing false information was not authorized by the Fifth Amendment. *Bassage*, 274 Mich App at 326-327. And even if the prosecutor engaged in governmental wrongdoing, Fung had "no right to present false testimony." *Id*. The trial court and the prosecutor were required to protect defendant's right to a fair trial. *Poma*, 96 Mich App at 732. Upon learning that Fung had a legitimate privilege, Fung had to be given an adequate explanation of the self-incrimination privilege, and if valid, to determine whether Fung intended to claim the protection of it at trial. This examination had to occur outside the presence of the jury. *Id*. at 732-733. The prosecutor complied with the procedure for determining whether a witness would exercise his Fifth Amendment right, and the contention that misconduct occurred was not found by the trial court or supported by the record. Furthermore, there was the intermediate action between the prosecutor's actions and Fung's decision, Fung's representation by and advice from his own counsel. Because Fung did not have the right to present false testimony, it cannot be concluded that his exercise of the Fifth Amendment deprived defendant of a defense. This claim is without merit.

III. SUBSTANTIVE EVIDENCE

Defendant next contends that the trial court erred by admitting Fung's statement to Gross as impeachment evidence instead of substantive evidence. We disagree.

Preserved evidentiary issues are reviewed for an abuse of discretion. *Thorpe*, 504 Mich at 252. An abuse of discretion occurs when the decision falls outside the range of principled outcomes. A decision on a close evidentiary question generally cannot constitute an abuse of discretion. *Id*. at 251-252.

Although we conclude that this issue was preserved because it was raised, addressed, and decided in the trial court, *People v Anderson*, 341 Mich App 272, 279; 989 NW2d 832 (2022), we also determine that it was waived. A waiver is the "intentional relinquishment or abandonment of a known right." *People v King*, 512 Mich 1, 9; 999 NW2d 670 (2023) (quotation marks and citation omitted). During trial, defense counsel affirmed[11] the prosecutor's position regarding the limited use of the evidence, extinguishing any error. *Id*.

On appeal, defendant further argues that trial counsel was ineffective for failing to argue that Fung's statement to Gross was substantively admissible under MRE 804(b)(3) as a statement against penal interest. This hearsay exception was examined in *People v Washington*, 468 Mich 667, 671; 664 NW2d 203 (2003):

> Declarations against penal interest constitute an exception to the general proscription against hearsay provided by MRE 802. MRE 804(b)(3), in pertinent part, defines a declaration against penal interest as
>
> > [a] statement which was at the time of its making . . . so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.
>
> The exception is based on the assumption that people do not generally make statements about themselves that are damaging unless they are true. *People v Poole,* 444 Mich 151, 161; 506 NW2d 505 (1993), citing the comment of the Advisory Committee on Federal Rules of Evidence relating to FRE 804(b)(3). Mathis's statement is against his penal interest and, therefore, is admissible.
>
> The inquiry, however, does not stop there because the Confrontation Clauses of the federal and state constitutions are implicated. US Const, Am VI; Const 1963, art 1, § 20. The admission of Mathis's statement as substantive evidence does not violate the Confrontation Clause if the prosecution can establish that Mathis was unavailable as a witness and that his statement bore adequate indicia of reliability. Alternatively, the Confrontation Clause is not violated if the statement fell within a firmly rooted hearsay exception. *Poole, supra* at 163.
>
> Some jurisdictions have held that the hearsay exception for statements against penal interest is a firmly rooted hearsay exception. See, e.g., *United States v McKeeve,* 131 F3d 1, 9 (CA 1, 1997), *People v Wilson,* 17 Cal App 4th 271, 278; 21 Cal Rptr 2d 420 (1993), and *State v Tucker,* 109 Ore App 519, 526; 820 P2d 834

---

[11] Defense counsel's affirmation was awkwardly phrased as a "don't disagree" with the prosecutor's position.

(1991). However, we need not decide that issue because Mathis had been charged with the crimes and was considered unavailable because it was expected that he would assert his Fifth Amendment right not to testify. Additionally, Mathis's statement bears adequate indicia of reliability.

In *Poole, supra* at 165, we instructed:

In evaluating whether a statement against penal interest that inculpates a person in addition to the declarant bears sufficient indicia of reliability to allow it to be admitted as substantive evidence against the other person, courts must evaluate the circumstances surrounding the making of the statement as well as its content.

The presence of the following factors would favor admission of such a statement: whether the statement was (1) voluntarily given, (2) made contemporaneously with the events referenced, (3) made to family, friends, colleagues, or confederates that is, to someone to whom the declarant would likely speak the truth, and (4) uttered spontaneously at the initiation of the declarant and without prompting or inquiry by the listener.

On the other hand, the presence of the following factors would favor a finding of inadmissibility: whether the statement (1) was made to law enforcement officers or at the prompting or inquiry of the listener, (2) minimizes the role or responsibility of the declarant or shifts blame to the accomplice, (3) was made to avenge the declarant or to curry favor, and (4) whether the declarant had a motive to lie or distort the truth.

Courts should also consider any other circumstance bearing on the reliability of the statement at issue. See, generally, *United States v Layton,* 855 F2d 1388, 1404-1406 (CA 9, 1988). While the foregoing factors are not exclusive, and the presence or absence of a particular factor is not decisive, the totality of the circumstances must indicate that the statement is sufficiently reliable to allow its admission as substantive evidence although the defendant is unable to cross-examine the declarant.

When those precepts are applied to the facts at bar, we find that Mathis's statement to the police officers bears sufficient indicia of reliability to satisfy Confrontation Clause concerns and to allow its admission as substantive evidence at trial. The statement was voluntarily given and made contemporaneously with the events referenced. It was uttered spontaneously by Mathis and without prompting or inquiry by the officers. In fact, the officers had just heard of the robbery when Mathis made the statement. Mathis did not minimize his role in the crimes, admitting that he shot the victim, and he had no motive to lie or distort the truth. In

addition, there is nothing in the statement indicating that the declarant was attempting to curry favor at the time he made the statement.

Thus, admission as substantive evidence of a statement against penal interest that inculpates a person will bear a sufficient indicia of reliability in light of the circumstances surrounding the statement. However, the only factor that favors the admission of Fung's statement is the fact that it was voluntarily given to Gross. Fung's statement was not made contemporaneously with the shooting but occurred almost three years later. Moreover, the statement was not made to an individual to whom Fung would likely speak the truth, but to Gross, who was defendant's hired investigator. Fung referred to defendant as "nephew" and admitted to being a friend of defendant's family, giving him a motive to curry favor with or to lie for defendant. Fung's statement was not uttered spontaneously and without prompting by Gross but was obtained in anticipation of the forthcoming trial the following week. And, although Fung previously denied witnessing the shooting, he now claimed to have seen a gun in the victim's hand to support defendant's claim of self-defense, shifting blame to the victim.

Defendant repeatedly claimed in the trial court that Fung's statement was consistent and merely supplemental information derived from a thorough investigation. However, Fung previously testified that he did not witness the shooting. Upon hearing the gunshot, Fung claimed to enter Duffy's bar. Now, Fung claimed to see the victim with a gun, an assertion that he had previously denied. On these facts, trial counsel was not ineffective for failing to raise a futile objection. *People v Chambers*, 277 Mich App 1, 11; 742 NW2d 610 (2007). Defendant is not entitled to appellate relief.

## IV. EX PARTE COMMUNICATIONS

Next, defendant argues that the trial court's ex parte communications with the deliberating jury entitle him to a new trial. We disagree.

Constitutional issues are reviewed de novo. *People v Johnson*, 340 Mich App 531, 542; 986 NW2d 672 (2022). In this case, defendant did not object; therefore, review is for plain error. *Carines*, 460 Mich at 763.

On Friday, January 13, 2023, the trial court instructed the jury. At the conclusion of the instructions, the alternate jurors were drawn, and the entire jury was informed that the alternates should not discuss the case with anyone in the event that something happened to one of the deliberating jurors. The jurors exited the courtroom at 5:24 p.m. There were no objections to the jury instructions, but the prosecutor submitted a new verdict form to correct a spelling error. At that time, the trial judge indicated that he would go back to the jury room with the court officer to determine if the jury wanted to stay late this evening or come back. At 5:26 p.m., the court recessed. At 5:36 p.m., the trial court indicated on the record that the jurors wanted to return Tuesday morning, January 17, 2023, at 9:30 a.m. The jury did advise that they wanted to view the exhibits, referencing the videos; however, the court noted that it had previously had issues with the small monitor and computer in the jury room. The prosecutor proposed arranging the viewing to occur in the courtroom. The trial court indicated that it would call the attorneys if it needed them on Tuesday morning.

When trial resumed on Tuesday, January 17, 2023, at 9:46 a.m., Paul Haas, the court officer, advised that "before deliberation," a juror called with a childcare issue. Specifically, the juror was unavailable because her childcare was closed because of a positive COVID test and she had no other childcare available. Although the attorneys did not place their appearances on the record, the trial court indicated that defense counsel was present in the courtroom, stating, "Well let me just start this and I can hear from [defense counsel] in just a moment." The trial court noted that they had two alternate jurors, and the jury had not even commenced jury deliberations. The trial court indicated there were two options, call an alternate to serve on the jury after ensuring that they had not discussed the case with others or create a temporary daycare. Defense counsel noted that excusing the juror meant the loss of the only juror of color, but if she could be replaced then, "I don't have an objection to it." Defense counsel rejected the option of proceeding with 11 jurors. After randomly drawing an alternate juror, a message was left with for her to call Haas. If that juror did not respond in ten minutes, the second alternate would be contacted.

Haas also reported that the jury had expressed its dissatisfaction with the technology available in the jury room. The court conveyed that "probably real soon after jury deliberations start," the jury wanted to watch the video surveillance, but did not want anyone else in the courtroom so that it could "talk." The prosecutor noted that other judges had permitted that procedure. Defense counsel noted that Haas would not be present but would get "the [court]room ready for them." To transform the courtroom into the jury room, Haas would ensure that no one else had access. The prosecutor advised that she could obtain a "clean laptop" from which the jurors could watch the videos. The trial court noted that Haas would lock the courtroom and monitor it.

After ten minutes, the trial court went back on the record at 10:03 a.m. and the other alternate juror was called. The trial court advised this alternate juror of the issue, again indicating that jury deliberations "actually haven't even started[.]" The trial court then asked if the alternate juror had discussed the case in any meaningful manner with anyone. The juror responded that she had not and that she could be there within thirty minutes. The trial court instructed Haas to advise the jury members that the alternate juror was on her way. Additionally, the trial court also advised Haas that, when the alternate juror arrived, "I'm going to go back there with you and formally let them know. I know they haven't deliberated, but with this new juror I want to make sure that she knows the rules of twelve and all that." After the court officer responded affirmatively, the trial court stated: "Then we'll officially restart jury deliberations when she gets here." Defense counsel responded, "Okay."

At 10:28 a.m., the proceedings were back on the record:

The Court: Just, just for the record I mean. All right well I said on the record what I was going to do.

The Prosecutor: Sure.

The Court: Do you want me to wait until he's here?

The Prosecutor: Judge . . . I would just like [Haas] to be the one to say that they're ready to deliberate. I just always get a little nervous and I understand the

-22-

Court[']s never going to do anything that's going to cause any concerns but we've already got a jury that had some issues and just for any appellate purposes, [Haas is] the only [one] to communicate with them. That's all judge.

The Court: Okay. Well, I'm going to do it because I have to advise them of the rule as well, that kind of thing. All twelve of them happen to be there.

Court Officer: Remain seated.

The Prosecutor: Thanks judge.[12]

MCR 2.513(B) states:

Court's Responsibility. The trial court must control the proceedings during trial, limit the evidence and arguments to relevant and proper matters, and take appropriate steps to ensure that the jurors will not be exposed to information or influences that might affect their ability to render an impartial verdict on the evidence presented in court. The court may not communicate with the jury or any juror pertaining to the case without notifying the parties and permitting them to be present. The court must ensure that all communications pertaining to the case between the court and the jury or any juror are made a part of the record.

In *People v France*, 436 Mich 138, 142; 461 NW2d 621 (1990), our Supreme Court altered the rule of automatic reversal when an ex parte communication occurred between a deliberating jury outside the courtroom and the presence of counsel. Instead, in order to reverse, there must be a showing of "any reasonable possibility of prejudice." *Id*. The Court further explained:

We find that communication with a deliberating jury can be classified into one of three categories: substantive, administrative, or housekeeping. Upon appeal, it is incumbent upon a reviewing court to first categorize the communication that is the basis of the appeal. This will necessarily lead to the determination of whether a party has demonstrated that the communication was prejudicial, or that the communication lacked any reasonable prejudicial effect.

Substantive communication encompasses supplemental instructions on the law given by the trial court to a deliberating jury. A substantive communication carries a *presumption* of prejudice in favor of the aggrieved party regardless of whether an objection is raised. The presumption may only be rebutted by a firm and definite showing of an *absence* of prejudice.

Administrative communications include instructions regarding the availability of certain pieces of evidence and instructions that encourage a jury to continue its deliberations. An administrative communication carries no

---

[12] It is unclear from the record whether defense counsel remained in the courtroom during this exchange.

presumption. The failure to object when made aware of the communication will be taken as evidence that the administrative instruction was not prejudicial. Upon an objection, the burden of persuasion lies with the nonobjecting party to demonstrate that the communication lacked any prejudicial effect. Alternatively, a reviewing court, upon its own volition, may find that an instruction which encourages a jury to continue its deliberations was prejudicial to the defendant because it violated the ABA Standard Jury Instruction as adopted by this Court in *People v Sullivan*, 392 Mich 324; 220 NW2d 441 (1974).

Housekeeping communications are those which occur between a jury and a court officer regarding meal orders, rest room facilities, or matters consistent with general "housekeeping" needs that are unrelated in any way to the case being decided. A housekeeping communication carries the presumption of no prejudice. First, there must be an objection to the communication, and then the aggrieved party must make a firm and definite showing which effectively rebuts the presumption of no prejudice. [*France*, 436 Mich at 142-144 (footnotes omitted).]

As an initial matter, we note that it appears that the jurors had not yet begun deliberations. After being given instructions on day five, the jurors opted not to begin deliberations at 5:26 p.m., but decided to commence their deliberations on Tuesday, January 17, 2023, at 9:30 a.m. At that time, however, the jury was unable to begin because not all jurors were present. Thus, the trial court did not engage in ex parte communications with a *deliberating* jury.

Although defendant contends that inappropriate ex parte communication occurred between the court and the jury, there is no record evidence to support that assertion. The trial court merely stated that it was going to apprise the jury regarding the "rule of twelve." Over 50 years ago, the United States Supreme Court recognized that "sometime in the 14th century the size of the jury at common law came to be fixed generally at 12, that particular feature of the jury system appears to have been a historical accident, unrelated to the great purposes which gave rise to the jury in the first place." *Williams v Florida*, 399 US 78, 89-90; 90 S Ct 1893; 26 L Ed 2d 446 (1970). And, in Michigan, for a felony case, 12 jury members resolve the issues raised during trial. MCL 768.18.[13] Given that the court was replacing an unavailable juror with an alternate juror, it is

---

[13] Mich Const 1963, art 1, § 20, reads "In every prosecution, the accused shall have the right to a . . . trial by an impartial jury, which may consist of less than 12 jurors in prosecutions for misdemeanors punishable by imprisonment for not more than 1 year[.]" MCL 768.18 pertinently states, "Any judge of a court of record in this state about to try a felony case which is likely to be protracted, may order a jury impaneled of not to exceed 14 members[.] . . . In the event more than 12 jurors are left on the jury after the charge of the court, the clerk . . . shall place the names of all of the [remaining] jurors on slips . . . and shall draw therefrom the names of a sufficient number to reduce the jury to 12 members who shall then proceed to determine the issue presented in the manner provided by law." See also MCR 6.410(A) ("Except as provided in this rule, a jury that decides a case must consist of 12 jurors. At any time before a verdict is returned, the parties may

plausible that it was informing the jurors that the deliberations were to occur with the alternate juror. See M Crim JI 3.11a.[14] In fact, the trial court followed the procedure outlined in *People v Tate*, 244 Mich App 553, 565-567; 624 NW2d 524 (2001), ensuring that the alternate juror had not discussed the case with anyone and stating its intention to instruct the jurors to begin deliberations anew. It appears that defense counsel agreed with the trial court's proposed procedure, stating: "Okay."

Even assuming that an ex parte communication with a deliberating jury occurred, it only pertained to administrative matters. Specifically, after being made aware that a juror would not come to court because of a childcare issue, the trial court, after consulting with counsel, decided to call the alternate jurors. The second juror answered the trial court's call, indicated that she had not meaningfully discussed the case with others and could be available within 30 minutes. The trial judge advised the parties that once the juror arrived, he would enter the jury room with the court officer and apprise the alternate juror of the "rule of twelve." It is apparent from the requirement that a jury in a felony case consist of 12 members and the need for a replacement juror that an explanation for the procedural change in its members was warranted.

We conclude that the trial court did not provide a supplemental instruction regarding the law to a deliberating jury that could be classified as a substantive communication. Rather, the trial court sought to advise the jury of the 12-juror requirement, the presence of the alternate juror, and to begin deliberations anew. "Administrative communications include instructions regarding the availability of certain pieces of evidence and instructions that encourage a jury to continue its deliberations." *France*, 426 Mich at 143. Moreover, "[t]he failure to object when made aware of the communication will be taken as evidence that the administrative instruction was not prejudicial." Notably, defense counsel never objected to the trial court's actions in providing an instruction addressing the rule of twelve and consented to the trial court's procedure for juror replacement. For all of these reasons, defendant has not established entitlement to relief.

V. REASONABLE AND PROPORTIONATE SENTENCE

Defendant contends that his sentence of 25 to 50 years' imprisonment is unreasonable and disproportionate. We disagree.

When a sentence is challenged on appeal for reasonableness, appellate review is for an abuse of discretion. *People v Steanhouse*, 500 Mich 453, 471; 902 NW2d 327 (2017). The sentencing guidelines must be consulted and taken into account when the trial court exercises its discretion when sentencing. *Id*. at 474-475. Ultimately, "the key test is whether the sentence is proportionate to the seriousness of the matter, not whether it departs from or adheres to the

---

stipulate with the court's consent to have the case decided by a jury consisting of a specific number of jurors less than 12."). Here, defense counsel rejected a verdict rendered by less than 12 jurors.

[14] M Crim JI 3.11a provides, "Members of the jury, one of your fellow jurors is unable to continue the deliberations with you. Do not consider the reasons for the juror's discontinued service. Alternate juror [*name alternate juror*] will now participate. You are now a new jury and must start over with your deliberations."

guidelines' recommended range[.]" *Id.* at 475 (quoting *People v Milbourn*, 435 Mich 630, 661; 461 NW2d 1 (1990). Michigan's principle of proportionality requires "sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Milbourn*, 435 Mich at 636. "An appropriate sentence should give consideration to the reformation of the offender, the protection of society, the discipline of the offender, and the deterrence of others from committing the same offense. However, these are not the only relevant sentencing criteria and trial courts are not required to consider each of these factors when imposing a sentence." *People v Boykin*, 501 Mich 171, 183-184; 987 NW2d 58 (2022) (citations omitted.).

"When a trial court sentences a defendant within the guidelines' recommended range, it creates a presumption that the sentence is proportionate." *People v Posey*, 512 Mich 317, 360; 1 NW3d 101 (2023) (Opinion by Bolden, J.). In this case, the sentencing guidelines recommended a sentence of 180 to 300 months' imprisonment. When reviewing the within-guidelines sentence on appeal, this Court applies "a nonbinding rebuttable presumption of proportionality." *Id*. The defendant has the burden of proving that the sentences imposed are unreasonable and disproportionate. *People v Klungle*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket Nos. 364125 and 367795), slip op at 5.

On September 25, 2024, Judge Susan B. Jordan resentenced defendant. She stated she had reviewed the parties' resentencing memoranda, the letters of support, the original sentencing, and "as much of the jury trial as I could squeeze in."

During his allocution, defendant apologized to the victim's family for their pain and trauma. He also said his imprisonment caused him to question the life he was living and he was using the time to become a better person.[15] Defendant claimed that he had grown as a person as reflected by the support letters and the presence of family in court. A sentence at the lower end of the guidelines range was requested.

The victim's coworker, aunt, cousin, and mother gave victim impact statements. The victim's cousin reported that she had previously suffered a miscarriage and was pregnant during the trial, causing her to question whether the stress would cause a second miscarriage. She also objected to the contention that the victim had a gun in his hand when the video reflected that it was the light from his phone.

The prosecutor argued that there were no mitigating factors surrounding this crime. And the jury rejected self-defense and found defendant guilty of second-degree murder. The prosecutor requested the same sentence be imposed.

---

[15] While in prison, defendant was cited for possession of contraband. Defendant explained that he had merely received a tattoo while incarcerated. The citation was imposed because he was deemed an accomplice to the person who performed the tattoo, who was in possession of implements. Defense counsel further acknowledged defendant's assaultive behavior or "tickets" while in jail. She alleged that scientific research revealed that this was a product of defendant's age and he was "maturing out of it."

The trial court again acknowledged that, in imposing the sentence, she listened to as much of the trial as possible, watched the previous sentencing, understood the jury verdict, and the reason for the resentencing. The trial judge noted that she had resentenced juvenile lifers and was cognizant of the neuroscience behind youth engaging in bad decision-making. She also recognized the balancing of all factors and administering a proportionate sentence. After examining all the facts and circumstances, the trial judge did not "see any mitigating factors." She noted that it was a senseless act of violence, involving introducing a firearm to an everyday conflict that resulted in a fatality. The trial court resentenced defendant to 25 to 50 years' imprisonment for the second-degree murder conviction and noted that the felony-firearm sentence had been served fully.

Because defendant was sentenced within the guidelines' recommended range, there is "a presumption that the sentence is proportionate." *Posey*, 512 Mich at 360. Defendant has the burden of proving that the sentence imposed is unreasonable and disproportionate. *Klungle*, ___ Mich App at ___, slip op at 5.

We conclude that defendant failed to prove that his 25-year minimum sentence for second-degree murder was unreasonable and disproportionate. Defendant claimed that his sentence was disproportionate, citing his lack of an extensive prior record,[16] his lack of an assaultive history, his learning disabilities, his employment, his assertion of self-defense, and the inability to thoroughly present this defense. The trial court was not required to cite or refer to all considerations and factors when imposing the sentence. *Boykin*, 510 Mich at 183-184 (citations omitted). "[T]rial courts are not required to expressly or explicitly consider mitigating factors at sentencing." *People v Bailey*, 330 Mich App 41, 64; 944 NW2d 370 (2019). And where the trial court was aware of the contents of the presentence investigation report (PSIR) that contained information addressing the defendant's background,[17] defendant cannot show that the trial court failed to take those facts into consideration. See *id*. Indeed, all the "mitigating factors" cited by defendant were included in the PSIR and discussed at the resentencing. The trial court was aware of the circumstances surrounding defendant's background and the offense and had reviewed the record. The prosecutor's theory of the case was that defendant shot the unarmed victim because of his relationship with Kowalsky while defendant asserted that the victim had a gun and that he acted in self-defense. The jury, however, did not validate defendant's self-defense theory.

And, although defendant claimed that he had experienced personal growth while in prison, the updated PSIR indicated that he had been assessed four major misconducts. On this record, the trial court did not abuse its discretion in sentencing defendant to 25 to 50 years' imprisonment for his second-degree murder conviction.

---

[16] Defendant was convicted of minor in possession in 2013, third-degree retail fraud in 2015, and assault and battery in 2016, all misdemeanors.

[17] Defendant's parents were teenagers when he was born. Because they were unable to care for him, defendant was raised by his grandmother on his mother's side. When he was 14, defendant went to live with his father and began to work in construction. Defendant became a father at age 16 and claimed to have a relationship with his daughter. Defendant denied any substance abuse issue although he admitted to using alcohol and marijuana.

Defendant submits that he was sentenced premised on inaccurate information because OVs 3 and 19 were scored incorrectly  We disagree.

Under the sentencing guidelines, the trial court's findings of fact are reviewed for clear error and must be supported by a preponderance of the evidence.  *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013); *People v Rhodes (On Remand)*, 305 Mich App 85, 88; 849 NW2d 417 (2014).  "Clear error is present when the reviewing court is left with a definite and firm conviction that an error occurred." *People v Fawaz*, 299 Mich App 55, 60; 829 NW2d 259 (2012) (quotation marks and citation omitted).  On the other hand, we review de novo "[w]ether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute[.]" *Hardy*, 494 Mich at 438; see also *Rhodes*, 305 Mich at 88.  When calculating the sentencing guidelines, a court may consider all record evidence, including the contents of a PSIR and preliminary examination testimony.  *People v Johnson*, 298 Mich App 128, 131; 826 NW2d 170 (2012).

Defendant's brief on appeal recognizes that the resentencing court properly assessed 25 points for OV 3 under our Supreme Court's holding in *People v Houston*, 473 Mich 399; 702 NW2d 530 (2005).  Defendant explains that he seeks to challenge *Houston* as being wrongly decided.  This Court, however, is bound to follow *Houston*.  See *People v Metamora Water Serv, Inc*, 276 Mich App 376, 387-388; 741 NW2d 61 (2007)  ("It is the duty of the Supreme Court to overrule . . . caselaw . . . [; however,] the Court of Appeals and the lower courts are bound by the precedent established by the Supreme Court until it takes such action.")

Addressing defendant's challenge to the sentencing court's assessment of 10 points for OV 19, this issue is unpreserved because there was no objection.  "[T]his Court may review an unpreserved scoring issue for plain error affecting substantial rights." *People v Chelmicki*, 305 Mich App 58, 68; 850 NW2d 612 (2014) (quotation marks and citation omitted).[18]

In pertinent part, MCL 777.49 provides that a trial court may assess 10 points when "[t]he offender otherwise interfered with or attempted to interfere with, or that results in the interference with the administration of justice[.]"  "[T]he plain and ordinary meaning of 'interfere with the administration of justice' for purposes of OV 19 is to oppose so as to hamper, hinder, or obstruct the act or process of administering judgment of individuals or causes by judicial process." *People v Hershey*, 303 Mich App 330, 343; 844 NW2d 127 (2013).  This interference encompasses more than just the actual judicial process. *People v Barbee*, 470 Mich 283, 287-288; 681 NW2d 348 (2004).  Law enforcement officers comprise an integral component in the administration of justice, and interfering with their duties, such as providing a false name, constitutes interference with the administration of justice for purposes of OV 19. *Id*. at 288.  OV 19 also "may be scored for aggravating conduct that occurred after the sentencing offense was completed" because the

---

[18] At one point, defense counsel stated there was no objection to the body of the PSIR. Additionally, there were repeated interjections to discuss restitution, the updated prison record, and the resentencing memorandum.  In light of these interruptions, we cannot agree with the prosecutor's argument that defendant's challenge to OV 19 was waived.

circumstances described in OV 19 expressly encompass acts that occur after the sentencing offense was completed. *People v Smith*, 488 Mich 193, 201-202; 793 NW2d 666 (2010).

"OV 19 is generally scored for conduct that constitutes an attempt to avoid being caught and held accountable for the sentencing offense." *People v Smith*, 318 Mich App 281, 286; 897 NW2d 743 (2016) (quotation marks and citation omitted). "Hiding from the police constituted an interference with the administration of justice because it was done for the purpose of hindering or hampering the police investigation." *Id.* Stated otherwise, "OV 19 is generally scored for conduct that constitutes an attempt to avoid being caught and held accountable for the sentencing offense." *People v Sours*, 315 Mich App 346, 349; 890 NW2d 401 (2016).

For the first time on appeal, defendant asserts that he merely returned to Iowa, his home state of residence, and retained counsel to negotiate a surrender in Michigan. Defendant raises these assertions in the narrative portion of his brief and does not cite to record evidence or seek to expand the record on appeal to warrant a remand to the trial court to further develop this claim. That is, he does not submit an affidavit delineating those facts or present documentation such as bills in his name mailed to an Iowa address to support the assertion.

The PSIR, however, expressly stated that "[o]fficers would be unable to locate the suspect in this case, [defendant], until he was apprehended by the U.S. Marshal[] Service in Cedar Rapids, Iowa on July 22, 2020." And Grove testified that the police searched for defendant locally and did not find him. Upon learning that defendant may have gone to Iowa, the Cedar Rapids Police Department was contacted for assistance. In late March 2020, Jackson police sought help from the U.S. Marshals. In July 2020, they were able to locate defendant, and he was transported back to Michigan. This testimony coupled with the PSIR statement constituted sufficient evidence to support the trial court's 10-point assessment for OV 19 under our caselaw.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Christopher M. Murray
/s/ Anica Letica

-29-